**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

TISLAM MOORE,

                                        Plaintiff

              - v -                                          Civil No. 9:01-CV-1607
                                                                      (GLS/RFT)

THOMAS RICKS, Superintendent Upstate Correctional Facility;
ARLENE BRANCH, Dietitian, DOCS; D. HAUG, Food Service
Administrator, Upstate Correctional Facility; GLENN S. GOORD,
Commissioner; THOMAS EAGAN, Director, Inmate Grievance
Program,

                                        Defendants.

**APPEARANCES:**                                            **OF COUNSEL:**

TISLAM MOORE
Plaintiff *Pro Se*
97-A-6282
Coxsackie Correctional Facility
P.O. Box 999
Coxsackie, New York 12051

HON. ELIOT SPITZER                                          MARIA MORAN, ESQ.
Attorney General of the State of New York                  Assistant Attorney General
Attorney for Defendants
615 Erie Boulevard West
Suite 102
Syracuse, New York 13204

**RANDOLPH F. TREECE**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER

Plaintiff Tislam Moore brings this *pro se* action pursuant to 42 U.S.C. § 1983 alleging

Defendants violated his civil rights.  Specifically, Moore alleges that, while he was incarcerated at

the Upstate Correctional Facility, Defendants were deliberately indifferent to his serious medical

needs when they, on multiple occasions, failed to provide nutritionally adequate food substitutions

for his known food allergies in accordance with his Therapeutic Diet Order Form, in violation of his

Eighth Amendment right to be free from cruel and unusual punishment.  Plaintiff also asserts his

First Amendment rights were violated when, in accordance with a Department of Correctional

Services Directive, he was denied a Religious Alternative Menu ("RAM") in combination with his

Therapeutic Diet.  Dkt. No. 8, Am. Compl.  Moore further alleges he was denied equal protection of

the laws, guaranteed by the Fourteenth Amendment, for the same acts.  *Id.*

Presently before this Court is Defendants' Motion for Summary Judgment pursuant to FED.

R. CIV. P. 56(b).  Dkt. No. 40.[1]  Plaintiff opposes the Motion.  Dkt. Nos. 44-47.[2]  For the reasons

that follow, it is recommended that Defendants' Motion be **granted** in part and **denied** in part.

## I.  BACKGROUND

The following material facts are uncontroverted.  Tislam Moore is an inmate in the custody

of the New York State Department of Correctional Services ("DOCS").  On March 31, 2000,

Plaintiff arrived at Upstate Correctional Facility and subsequently requested a test for food allergies.

Dkt. No. 40, Attach. 3, Dfts.' 7.1 Statement at ¶¶ 1-2; Dkt. No. 45, Pl.'s 7.1 Statement at ¶¶ 1-2.  An

allergy test was administered and revealed that Plaintiff was allergic to egg whites, milk, wheat,

peanuts, and corn.  Dfts.' 7.1 Statement at ¶ 3; Pl.'s 7.1 Statement at ¶ 3; *see also* Dkt. No. 40, Ex.

A, Mem. to Plaintiff from S. Miller, N.P., dated August 15, 2000.  A special diet was thereafter

drafted for Plaintiff based upon his food allergies, and the Food Service Unit changed Plaintiff's diet

accordingly on August 16, 2000.  Dfts.' 7.1 Statement at ¶¶ 3-4; Pl.'s 7.1 Statement at ¶¶ 3-4; *see*

---

[1] The Motion was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] Plaintiff's submissions were titled "Notice of Motion" as if to suggest Plaintiff himself was cross moving for summary judgment.  However, upon inspection of the papers submitted, it is clear to this Court that Plaintiff is simply opposing the Defendants' Motion and his submission will therefore be treated by this Court as just that.

*also* Dkt. No. 40, Ex. B, Therapeutic Diet Order Form, dated August 15, 2000; Ex. D, Modified

Menu.  Plaintiff filed numerous grievances in which he claimed that on certain dates, between

August 16, 2000 through at least May 20, 2001,[3] he was either served foods he should not eat

because of his food allergies, or he did not receive a substitution for those same prohibited food

items and essentially received less food on his tray.  Dfts.' 7.1 Statement at ¶ 5; Pl.'s 7.1 Statement

at ¶ 5; *see also* Dkt. No. 46, Moore Aff., Exs. A-D (consisting of numerous grievances filed by

Moore as well as the responses thereto).[4]  On April 28, 2001, in response to continued complaints

registered by Plaintiff regarding his meals, the food service staff began keeping a log of exactly

what Plaintiff was served at each meal; the log was signed or initialed by the cook who prepared the

particular meal and was kept through November 13, 2001, the date Plaintiff was transferred from

Upstate to another facility.  Dfts.' 7.1 Statement at ¶ 6; Ex. C, Food Log, dated April 28, 2001

through May 20, 2001.[5]

On June 20, 2001, Plaintiff filed Grievance UST-8293-01, in which he claimed he was being

denied the religious alternative diet in violation of his First Amendment rights.  Dfts.' 7.1 Statement

at ¶ 7; Pl.'s 7.1 Statement at ¶ 7; *see also* Dkt. No. 40, Ex. F (grievance).  On June 21, 2001, the

Inmate Grievance Resolution Committee ("IGRC") advised Plaintiff that he would have to sign a

waiver to take himself off the allergy diet he currently received since, according to Arlene Branch,

Regional Dietitian, he could not be on the alternative diet.  *Id.*  Plaintiff appealed the IGRC's

---

[3] Prior to his transfer to Upstate, Plaintiff was sentenced to twenty-four months in a special housing unit (SHU) after a Tier III Superintendent's Disciplinary Hearing was conducted.  It appears that throughout his occupancy at Upstate, and at least during the time frame when the alleged constitutional violations occurred, Plaintiff was housed in SHU.  *See* Dkt. No. 8, Am. Compl. at ¶ 14; Dkt. No. 47, Pl.'s Mem. of Law at p. 1.

[4] Exhaustion of remedies is not at issue in this case.

[5] Defendants only submitted that portion of the food log which pertains to the subject dates of this lawsuit.

*-3-*

response to the Superintendent who elaborated that the Regional Dietitian advised Plaintiff not to switch to the alternative diet/Religious Alternative Menu due to his many allergies, because he would not receive nutritionally adequate meals; Plaintiff, however, was at liberty to disregard the Regional Dietitian's recommendations and choose the RAM if he signed a waiver to that effect. *Id.* Plaintiff further appealed to the Central Office Review Committee ("CORC"). *Id.* On August 8, 2001, K. Bellamy responded on Director Eagan's behalf noting that the CORC unanimously denied Plaintiff's request. *Id.*[6]

DOCS Directive # 4311, Therapeutic Diets, Section II.04, Religious Alternative Menu, states, in part:

The Religious Alternative Menu is **not** a therapeutic diet and shall **not** be prescribed by the health care provider. The Religious Alternative entrees are **not** offered in combination with any therapeutic diet restrictions.

Dfts.' 7.1 Statement at ¶ 8; Pl.'s 7.1 Statement at ¶ 8; *see also* Dkt. No. 40, Ex. F at p. 7.

Many of the RAM food items contain eggs, cheese, and soy-based products, which include wheat and corn. Dfts.' 7.1 Statement at ¶ 9; *see also* Dkt. No. 40, Donald Haug, Food Service Administrator at Upstate Correctional Facility, Aff. at ¶ 8.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers

---

[6] Plaintiff also filed grievances regarding religious meals on September 6, 2000 (UST-5575-00), May 20, 2001 (UST-8038-01), June 14, 2001 (UST 8445-01), June 29, 2001 (UST 8615-01), July 3, 2001 (UST-8528-01), and August 11, 2001 (UST 8991-01). Dkt. No. 46, Moore Aff., Exs. A-D. Each of these grievances were adjudicated by all three levels of Upstate's Grievance Program in the same manner. The June 20, 2001 Grievance was submitted by Defendants as an Exhibit in support of their Motion; all other grievances were attached to Plaintiff's opposition papers.

to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine

issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986)).  To defeat a motion for summary judgment, the non-movant

must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on

"mere allegations or denials" of the facts submitted by the movant. Fed. R. Civ. P. 56(e); *see also*

*Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are

ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set

out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir.

1994).  To that end, sworn statements are "more than mere conclusory allegations subject to

disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and

should be treated as evidence in deciding a summary judgment motion" and the credibility of such

statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v.*

*Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.

1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities

and draw all reasonable inferences in favor of the non-movant.  *Nora Beverages, Inc. v. Perrier*

*Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary

judgment motion stage of the litigation is carefully limited to discerning whether there are any

genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this

point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential*

*Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Furthermore, where a party is proceeding

*pro se*, the court must "read [his or her] supporting papers liberally, and . . .  interpret them to raise

the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994),

*accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995).

### B. Eleventh Amendment

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted against one of the United

States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  Although by

its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court

has held that such amendment similarly bars suits against a state by its own citizens. *Hans v.*

*Louisiana*, 134 U.S. 1 (1890).  "The Eleventh Amendment thus 'affirm[s] that the fundamental

principle of sovereign immunity limits the grant of judicial authority in Art. III.'" *Richardson v.*

*New York State Dep't of Corr. Servs.*, 180 F.3d 426, 447-48 (2d Cir. 1999) (*citing Pennhurst State*

*School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984))).  Thus, sovereign immunity provided

for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal

court. *Pennhurst*, 465 U.S. at 98; *Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993);

*Daisernia v. State of New York*, 582 F. Supp. 792 (N.D.N.Y. 1984).  To the extent a state official is

sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state,

and the official is entitled to invoke the eleventh amendment immunity belonging to the state."

*Rourke v. New York State Dep't. of Corr. Servs.* 915 F. Supp. 525, 539 (N.D.N.Y. 1995) (citing

*Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying*

*Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir. 1993)); *see also Mathie v. Fries*, 121 F.3d

808, 818 (2d Cir. 1997) ("A claim against a government officer in his official capacity is, and

should be treated as, a claim against the entity that employs the officer . . . .").

However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint.  The Second Circuit has held that in accordance with *Ex parte Young*, 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be the subject of injunctive or declaratory relief in federal court."  *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606; *see also Rourke*, 915 F. Supp. at 540.  Since the only relief sought herein is compensatory monetary relief, Plaintiff's claims against all Defendants in their official capacities should be **dismissed**.

### C.  Eighth Amendment Claim

In his Amended Complaint, Moore asserts that Thomas Ricks, Superintendent of Upstate Correctional Facility, Arlene Branch, DOCS Dietitian, Donald Haug, Food Service Administrator at Upstate Correctional Facility, and Thomas Eagan, Director of Inmate Grievance Program, violated his Eighth Amendment right to be free from cruel and unusual punishment when, on a number of occasions between August 16, 2000 and May 20, 2001, they denied Plaintiff complete nutritional meals that correctly addressed his allergy and medical needs.  Dkt. No. 8, Am. Compl. at ¶¶ 31 & 49.  As a result of Defendants' conduct, Plaintiff alleges he suffered from starvation causing him to lose weight.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Robinson v. California*, 370 U.S. 660, 666-67 (1962) (cited in *Tramell v. Keane, et al.*, 338 F.3d 155, 161 (2d Cir. 2003)).  To prove a violation of the Eighth Amendment, the Second Circuit stated that an inmate must show,

(1) that the deprivation alleged is 'objectively sufficiently serious' such that the plaintiff

was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain.'

*Trammell v. Keane*, 338 F.3d at 161 (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).

"[Once incarcerated], only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (cited in *Trammell*, 338 F.3d at 162). Punishments prohibited by the Eighth Amendment include those that are "grossly disproportionate" to the severity of the crime including unnecessary and wanton inflictions of pain which are "totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (citations omitted); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002).

Under the Eighth Amendment, sentenced prisoners are entitled only to "adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978). When the plaintiff is challenging prison conditions as the basis of an Eighth Amendment claim, the inmate must allege a "sufficiently serious" deprivation under an objective standard and that prison officials subjectively acted with deliberate indifference to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. at 834; *see also Wilson v. Seiter*, 501 U.S. 294, 297-98 (1991) (cited in *Waring v. Meachum*, 175 F. Supp. 2d 230, 238-39 (D. Conn. 2001)). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the 'minimal civilized measure of life's necessities.'" *Wilson v. Seiter*, 501 U.S. at 298 (quoting *Rhodes v. Chapman*, 452 U.S. at 347). Additionally, the prison officials must have acted with deliberate indifference, in that they "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Branham v. Meachum*, 77 F.3d 626, 631 (2d Cir. 1996) (quoting *Hathaway v.*

*Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).  In *Farmer*, the Supreme Court indicated that a

deliberately indifferent subjective state of mind may be inferred "from the fact that the risk of harm

is obvious."  511 U.S. at 842 (cited in *Hope v. Pelzer*, 536 U.S. at 738).

        Similarly, in the context of medical care or medical conditions, the plaintiff must allege

conduct that is "'repugnant to the conscience of mankind' or 'incompatible with the evolving

standards of decency that mark the progress of a maturing society.'"  *Ross v. Kelly*, 784 F. Supp. 35,

44 (W.D.N.Y. 1992), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. 97,

102, 105-06 (1976)).  To state a claim for denial of medical care, a prisoner must demonstrate (1) a

serious medical condition and (2) deliberate indifference.  *Farmer*, 511 U.S. at 834-35; *Hathaway v.*

*Coughlin*, 37 F.3d at 66.  The first prong is an objective standard and considers whether the medical

condition is sufficiently serious.  The Second Circuit has stated that a medical need is serious if it

presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'"  *Chance v.*

*Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway*, 37 F.3d at 66).  Among the

relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient

would find important and worthy of comment or treatment; the presence of a medical condition that

significantly affects an individual's daily activities; or the existence of chronic and substantial pain."

*Chance v. Armstrong*, 143 F.3d at 702 (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir.

1992)).  The second prong is a subjective standard requiring a plaintiff to demonstrate that the

defendant acted with the requisite culpable mental state similar to that of criminal recklessness.

*Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway*, 37 F.3d at 66.  A plaintiff must demonstrate that

the defendant acted with reckless disregard to a known substantial risk of harm.  *Farmer*, 511 U.S.

at 835.  This requires "something more than mere negligence . . .  but something less than acts or

omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*.; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).

As aforementioned, in the case at hand, Plaintiff asserts that Defendants Ricks, Branch, Haug, and Eagen denied him nutritionally adequate meals that conform to his specific food allergies.  Specifically, Plaintiff alleges that on various days, he was served food items which he is allergic to, or, he did not receive proper substitutions for the food items he could not eat.  Some of Plaintiff's more frequent complaints include 1) he did not receive a substitute for milk when it was served on the breakfast tray to the rest of the general population; 2) he did not receive a substitute for eggs when they were served to the rest of the general population; and 3) he was often served foods he could not eat without any substitute, forcing him to starve.  *See generally* Dkt. No. 46, Exs. A-D (various correspondences and grievances filed by Plaintiff detailing diet issues and institution responses thereto).

In support of his allegations, Moore has provided, as an attachment to his submissions opposing Defendants' Motion, a detailed list of days in which foods he is allergic to were served to the general population.[7]  *See* Dkt. No. 46, Moore Aff., Ex. C.  He states in his affidavit that, "[f]or the months of August 16, 2000 through April 28, 2001, egg products were served for at least 100 different meals."  Moore Aff. at ¶ 62.  Exhibit C, attached to Moore's Affidavit, consists of three hand written pages listing each month and corresponding days and meals when food items he is allergic to were served; Plaintiff then attaches thirty-three pages of what appears to be the General Confinement Menu ("regular menu") for the period of August 21, 2000 through August 27, 2001,

---

[7] Moore alleges that during the entire time in question, he was housed in a special housing unit due to circumstances encountered while housed at another correctional facility.  *See supra* note 3.

*-10-*

though there appear to be some lapses in the time frames for these menus.  Moore Aff., Ex. C.

It is unclear from this submission, however, whether each and every time the general population received foods that Plaintiff is allergic to, he necessarily received the same.  Such confusion stems not only from the exhaustive list Plaintiff has provided, but also from the apparent contradictions unveiled when this list is compared to Plaintiff's Amended Complaint.  For much of his Amended Complaint, Moore details various instances, spanning August 24, 2000 through November 7, 2000, wherein he wrote grievances on the matter of his diet.  Dkt. No. 8, Am. Compl. at ¶¶ 16-28.  He then lists the following dates in 2001 as dates Defendants Ricks, Haug, and Branch denied him complete nutritional meals that properly addressed his allergy and medical needs:

> January 2, 8, 10; February 5, 7, 9, 10, 13, 14, 15, 17, 18, 19, 20, 24; March 1, 2, 5, 7, 9, 16, 31; April 2, 6, 12, 13, 20, 22, 26, 27; May 5, 12, 15, 17, 18, 20.

Am. Compl. at ¶ 29.

In Exhibit C, however, Plaintiff includes in his written list virtually everyday in what purports to be the corresponding months.[8]  For example, Moore's handwritten list of alleged violations for the month of January 2001 includes January 2, 4, 5, 8, 10-13, 16-21, 23, 25-28, and 30; clearly this written list is more inclusive than his Amended Complaint.  In fact, each month listed in the written exhibit is considerably more inclusive than those in his Amended Complaint.

Similar contradictions arise when the Court viewed excerpts of Plaintiff's deposition transcript wherein Defendants' counsel sought clarification for the dates listed in his Amended Complaint as to specific meals he alleges lacked proper substitutions and/or nutritional value.  *See* Dkt. No. 40, Ex. E.  For example, at his deposition, upon questioning, Plaintiff testified that on

---

[8] Plaintiff does not provide a year for his handwritten exhibit.  In construing this ambiguity in Plaintiff's favor, we assume, for the moment, however, that such list corresponds to the regular menu submitted for the same time frame, that is August 2000 through August 2001.

January 2, 2001, he was served corn flakes and eggs for breakfast, yet, in his written list, he states that the only violation occurring on January 2, 2001, was that he was served "hard cooked eggs" for breakfast; Plaintiff testified that on January 10, 2001 and February 7, 2001, he received egg salad and buttered noodles for lunch, yet, in his written list, he states that on both those dates the sole infraction was being served egg salad at lunch.  Further, due to Plaintiff's voluminous internal complaints, the messhall began keeping track of each item of food placed on Plaintiff's tray at each meal.  Dkt. No. 40, Ex. C, Daily Meal Log.  A comparison of this list against Plaintiff's written list reveals even more inconsistencies.  For example, at his deposition, Moore testified that on May 5, 2001, he received macaroni salad, soup, potato, and corn for lunch; in his written exhibit he indicates he was served soup and macaroni salad for lunch; however, the daily log maintained by the messhall indicates that on May 5, 2001, Plaintiff was served tuna, soup, plums, rice cakes, and a "huggie"[9] for lunch.  Moore testified that on May 12, 2001, he received pizza and pasta salad for lunch; his written exhibit states he was served boiled potato, turkey, pizza, and pasta for lunch; yet, the daily log shows Moore received potatoes, turkey, rice cakes, and a huggie.  *Compare* Dkt. No. 46, Moore Aff., Ex. C *with* Dkt. No. 40, Exs. C & E.

While Defendants vociferously contest the veracity of such deprivations, they also argue that even if Plaintiff's allegations were found to be true, they are not sufficiently serious to satisfy the objective prong.  In the same vein, Defendants submit that Plaintiff's food allergies are not serious medical conditions.  This Court agrees with Defendants' postulations on both accounts.  Further, the Court finds that Plaintiff's written Exhibit C has not, in our estimation, sufficiently raised any issues of material facts.  Such conclusion is based on the incomprehensible composition of the written

---

[9] A "huggie" is the term used to refer to an eight ounce fruit drink.  *See* Dkt. No. 40, Haug Aff. at ¶ 6.

Exhibit due to the lack of specificity as to the corresponding year, and in light of the fact, as demonstrated above, that the written Exhibit belies the greater portion of Moore's previous sworn statements as to the extent of his nutritional deprivation.

The Eighth Amendment does require that prisoners be served "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1989)); *see also Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (prisoners are guaranteed a nutritionally adequate diet). We acknowledge that the denial of a medically prescribed diet may constitute an Eighth Amendment violation under certain circumstances. *Robles v. Coughlin*, 725 F.2d at 15-16 (cited in *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996)); *see also Johnson v. Harris*, 479 F. Supp. 333 (S.D.N.Y. 1979) (denial of medically required diet to a diabetic prisoner violates constitutional rights); *but cf. Ramsey v. Coughlin*, 1 F. Supp. 2d 198 (W.D.N.Y. 1998) (inmate not constitutionally entitled to vegetarian diet).

While the precise extent of the alleged deprivations visited upon Plaintiff are ambiguous, the irrefutable fact remains that even in spite of being served certain foods which may be inedible, other food on Plaintiff's tray remained consistent with his dietary needs and were thus edible. Plaintiff complains that he did not receive a substitution for milk and suggests that juice could have been substituted. Plaintiff was told, on multiple occasions in response to grievances filed on this very subject, that juice is not a nutritional substitution for milk, that he had water in his cell to drink, and that if he felt he needed more nutrition, he should contact the medical ward for a calcium

supplement.[10]  According to Donald Haug, Food Service Administrator, inmates are typically served either a piece of fresh fruit or fruit juice for breakfast and are provided huggies as beverages for lunch and dinner.  Dkt. No. 40, Haug Aff. at ¶ 6.  Therefore, on the dates that Plaintiff received no substitute for milk, he still had access to water in his cell, as well as fresh fruit, in addition to other items served at that meal.  Plaintiff also frequently complained that he did not receive a substitute for eggs when they were served.  According to Haug, "[w]hen eggs were served for breakfast, the Regional Dietitian[, Arlene Branch,] directed that inmates who could not eat eggs receive four (4) slices of toast.  Because of [Moore's] wheat allergy, he received four (4) rice cakes instead.  Rice cakes also replaced any bread on the lunch or dinner menus."  Haug Aff. at ¶ 7; *see also* Dkt. No. 40, Ex. C (log of Plaintiff's meals); Ex. D (example of how Plaintiff's meal menus were specifically altered as planned by Arlene Branch).

Further, this Court finds that Plaintiff's food allergies are not sufficiently serious medical conditions.  *See Porter v. Coombe*, 1999 WL 587896, at *3 (S.D.N.Y. Aug. 4, 1999) (allergy to milk is not sufficiently serious medical condition).  A medical condition is objectively considered serious if it is a "condition of urgency" that may result in "degeneration" or "extreme pain."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (cited in *Perez v. Hawk*, 302 F. Supp. 2d 9, 20 (E.D.N.Y. 2004)).  At his deposition, Moore testified that on one occasion he ate egg noodles and his arms and legs "became rashed up."  Dkt. No. 40, Ex. E at E12.  When he sought medical care he was told that the rash was minimal and not to worry about it.  *Id*.  The rash cleared up after a

---

[10] Notably, when Plaintiff did approach a doctor for the supplement, the doctor found that there was "no medical indication for [a] calcium supplement."  *See* Dkt. No. 46, Ex. D, Supt. Decision Grievance UST 8237.  The Court acknowledges the predicament Plaintiff was placed in as a result of this apparent tug-of-war between the two departments, however, such claim is not properly before us as Plaintiff has not named any medical staff as Defendants in this action.

couple of days.  While the Court recognizes that food allergies have the potential of being life

threatening, Moore has not put forward any evidence to suggest that his allergies fall within this dire

category.[11]  *See Liscio v. Warren*, 901 F.2d 274, 277 (2d Cir. 1990) (condition must be life-

threatening or fast-degenerating) (cited in *Perez v. Hawk*, 302 F. Supp. 2d at 20).

However, even if this Court were to find that such deprivations constituted a serious enough

circumstance, and Moore's allergies constituted a serious medical condition, thereby satisfying the

objective prong of his Eighth Amendment claim, Moore has not alleged that the Defendants acted

with a sufficiently culpable subjective state of mind.  While the denial of a medically prescribed diet

may constitute an Eighth Amendment violation, "mere negligence or inadvertent failure to provide a

medically necessary diet is not a constitutional violation[; d]eliberate indifference must be

demonstrated by proof that corrections personnel *intentionally* denied, delayed access to, or

---

[11] In his Memorandum of Law in Opposition to Defendants' Motion, Moore asserts, for the first time, that he was diagnosed with Celiac Disease.  Celiac Disease is a hereditary disorder "caused by sensitivity to the gliadin fraction of gluten, a cereal protein found in wheat and rye and less so in barley and oats."  *The Merck Manual*, 299-300 (17th ed. 1999).  To elaborate further, Celiac disease is a

> digestive disease that damages the small intestine and interferes with absorption of nutrients from food. People who have celiac disease cannot tolerate a protein called gluten, which is found in wheat, rye, and barley.  When people with celiac disease eat foods containing gluten, their immune system responds by damaging the small intestine.  Specifically, tiny fingerlike protrusions, called villi, on the lining of the small intestine are lost.  Nutrients from food are absorbed into the bloodstream through these villi. Without villi, a person becomes malnourished–regardless of the quantity of food eaten.

*National Digestive Diseases Information Clearinghouse (NDDIC), available at* http://digestive.niddk.nih.gov/ddiseases/pubs/celiac/index.htm#1 (last visited September 13, 2004).

In our view, Celiac Disease imports a condition more serious than simply food allergies.  Moore has not provided any physician diagnosis to that effect, nor has he produced any medical reports indicating he suffered from any symptoms of this disease.  It is not clear to this Court, and Defendants have not weighed in on the matter, whether simply by virtue of being allergic to wheat, it follows that Plaintiff would automatically be diagnosed with Celiac Disease.  The lack of any physician diagnosis certainly suggests otherwise.  As such, the Court assesses the seriousness of his medical condition based only upon the evidence submitted and not upon the Plaintiff's medical conjectures.  In any event, was this Court to find that Plaintiff's medical condition was in fact Celiac Disease and was sufficiently serious, Moore still must provide proof showing Defendants knew of this condition and its serious connotations and disregarded any risks; Plaintiff has not indicated that any Defendant, let alone any official at the correctional facility, were aware of the existence of a medical condition beyond food allergies.  Therefore, Plaintiff's inclusion of his alleged disease does not sufficiently raise an issue of fact.

interfered with the prescribed treatment." *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)) (emphasis added).  Moore claims that his suffering was in the form of starvation and that he lost considerable amount of weight.  In his deposition, Moore testified that, in addition to weight loss, he suffered from headaches, rashes, and sleepless nights, yet, he admitted that he never sought medical treatment for such ailments.  Moore does not specify how much weight he lost, nor has he submitted evidence that documents any physical injuries he suffered as a result of Defendants' allegedly unconstitutional actions.[12]

There has been no evidence submitted which even suggests that, to the extent Defendants Branch, Haug, Ricks, and Eagen maintained any control over the specific meals Plaintiff was served, they failed to provide Plaintiff with adequate meals for the sole purpose of causing him harm or that they ignored evidence that Plaintiff's health was in danger.  Peering closer at the Defendants' individual actions unveils a posture of concern, rather than deliberate indifference.  For Defendant Arlene Branch's part, she carefully coordinated a menu that was specifically tailored to all of Plaintiff's allergy needs.  *See* Dkt. No. 40, Ex. D.  Such action was consistent with her position as Regional Dietitian and can hardly constitute deliberate indifference.  Branch further exemplified her concern for Plaintiff's health and safety when she recommended that he not be taken off his special diet in place of the Religious Alternative Menu since such menu would not accommodate his specific dietary needs.  *See* Dkt. No. 40, Ex. F, Pl.'s Grievance UST 8293-01 and appeals

---

[12] Moore is precluded from offering any documents, except his DOCS records, evidencing his weight loss, due to his refusal to obey this Court's Order directing him to respond to Defendants' discovery requests.  *See* Dkt. Nos. 28-29, Defs.' Mot. to Compel Discovery; Dkt. No. 30, Order, dated July 15, 2003 (directing Plaintiff to respond to Defendants' discovery requests); Dkt. Nos. 33-34, Defs.' Mot. to Preclude; Dkt. No. 37, Order, dated December 12, 2003 (prohibiting Plaintiff from introducing certain evidence).

*-16-*

(requesting to be placed on RAM).[13]

Similarly, Defendant Haug, as Food Service Administrator at Upstate, ensured that Plaintiff, in accordance with his medical needs, received nutritionally balanced meals.  Dkt. No. 40, Haug Aff. at ¶ 10.  On the few occasions Plaintiff contacted Haug directly, Haug promptly responded.  For example, on February 14, 2001, Plaintiff wrote Haug a letter complaining that he could not eat the potato salad because it contained eggs.  Dkt. No. 46, Ex. A.  In a memorandum, dated February 23, 2001, Haug advised Plaintiff that per the Regional Dietitian, a non-egg potato salad was to be served to those inmates who had egg allergies, and to contact the messhall if he did not receive the correct potato salad.  Haug Aff. at ¶ 9.  Haug also avers that at no time was he ever advised by medical staff at Upstate that Plaintiff's health was endangered by the meals he was served.  *Id*. at ¶ 10.  Such proffer is consistent with the fact that Plaintiff has not alleged that he sought any medical treatment throughout the ten months he was allegedly denied adequate nutrition, nor has he presented his DOCS medical record as substantiation to that effect.

As for Defendants Ricks and Eagen, it is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).  The Second Circuit has stated that a supervisory defendant

---

[13] The Superintendent's response to Plaintiff's appeal of this grievance states, in part:
> The Regional Dietitian stated that the grievant has several allergies which interfere with him being able to receive the RAM diet.  There is no way the grievant can be placed on the RAM/alternative diet and receive nutritionally adequate meals.  The grievant is receiving a modified diet to address his allergies.  The grievant can choose not to receive a particular diet, however, if he chooses to disregard the Regional Dietitian's recommendation, the grievant would have to sign a waiver.

Dkt. No. 40, Ex. F.

may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (defendant may not be held liable simply because he holds a high position of authority). Plaintiff has not suggested that either Defendant Ricks or Eagen failed to adequately investigate and respond to his grievances. In fact, such claims would be incongruous with the documentation Plaintiff submitted which confirms that these Defendants did indeed investigate the battalion of grievances filed by Plaintiff. Rather, Plaintiff simply disagrees with the unsatisfactory results of his multitudinous grievances. As such, we conclude that Plaintiff has not adequately attributed personal involvement on the parts of Defendants Ricks and/or Eagen.[14]

In light of the above analysis, we find that Plaintiff has not sufficiently alleged Defendants Branch, Haug, Eagen, and/or Ricks violated his Eighth Amendment rights, and, as such, we recommend such claims be **dismissed**.

---

[14] To the extent Plaintiff's Amended Complaint can be liberally construed as asserting an Eighth Amendment Claim against Defendant Goord, the Court similarly finds that Plaintiff has failed to assert any personal involvement, therefore, such claim, if stated, should be dismissed.

### D. Fourteenth Amendment Claims

Plaintiff has also asserted that Defendants Branch, Haug, Ricks, and Eagen have violated his Fourteenth Amendment rights.  With regard to Branch, Haug, and Ricks, it is unclear to this Court which clause under the Fourteenth Amendment Plaintiff is claiming injury, *i.e.*, whether he is asserting a due process or equal protection violation.  Moore specifically notes, however, that as to Defendant Eagen, he is asserting an equal protection violation.  Moore's equivocation on his Fourteenth Amendment claims against these Defendants yields the inevitable conclusion that such claims lack merit.

To state an equal protection claim, a claimant must show that a government actor intentionally discriminated against them on the basis of race, national origin or gender.  *Maher v. Roe*, 432 U.S. 464, 470 (1977); *see also Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) ("To prove an equal protection violation, claimants must prove purposeful discrimination directed at an identifiable or suspect class.") (quoted in *Verdal v. Frantz*, 2002 WL 31309175, at *3 (N.D.N.Y. July 31, 2002)).  In *Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999), the Second Circuit explained that such intentional discrimination could be demonstrated in several ways:

> First, a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 227-29, 115 S.Ct. 2097, 2105, 2112-14, 132 L.Ed.2d 158 (1995).  In addition, a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion.  *See Yick Wo v. Hopkins*, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 1072-73, 30 L.Ed. 220 (1886).  Lastly, a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect.  *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 264-65, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

*Hayden v. County of Nassau*, 180 F.3d at 48.

With regard to Defendants Branch, Haig, and Ricks, Moore has not alleged that he is a

member of an identifiable or suspect class; nor has he alleged circumstances where similarly situated prisoners were treated differently.  In order to state a claim for a violation of equal protection rights, "it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently."  *Gagliardi v. Village of Pawling,* 18 F.3d 188, 193 (2d Cir. 1994) (cited in *Tookes v. Artuz*, 2002 WL 1484391, at *2 (S.D.N.Y. July 11, 2002)).  Accordingly, to the extent Moore is asserting equal protection claims against Branch, Haug, and Ricks, in addition to the claim clearly stated against Defendant Eagen, Moore has failed to allege a cognizable equal protection violation and Defendants' Motion should be **granted** as to this claim.

As to Defendant Goord, in construing Plaintiff's claims liberally, it appears that Plaintiff suggests that DOCS Directive 4311, which precludes inmates from receiving a therapeutic diet contemporaneously with the RAM diet, violates his equal protection rights pursuant to the Fourteenth Amendment.  *See* Dkt. No. 8, Am. Compl. at ¶ 40.  In his Memorandum of Law, Plaintiff explains how this prison policy discriminates against him as a member of a "sick" or "disabled" class, as distinguished from the "non-sick" or "non-disabled" inmate population, by forcing him to choose between his health and his religious scruples.[15]  The Second Circuit applies a reasonableness standard to claims challenging prison regulations, in that prison officials need only show that the challenged regulation had a reasonable relation to a legitimate penological interest. *See Benjamin v. Coughlin*, 905 F.2d 571, 575 (2d Cir. 1990) (applying the *Turner/Shabazz* standard, described more fully below, to equal protection claims in the prison setting); *see also Griffin v. Coughlin*, 743 F. Supp. 1006, 1010-11 (N.D.N.Y. 1990) (following the Second Circuit's directive and applying *Turner's* four factor reasonableness test to equal protection claims arising in the prison

---

[15] Plaintiff has not raised a claim pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

context). Defendants, however, have not moved for summary judgment on this claim.  Nevertheless,

the Court finds that Plaintiff raises an issue of material fact with regard to the reasonableness of

Directive 4311, as explained more fully below.  *See infra* Part II.E.

      To the extent Plaintiff is asserting a due process claim against Defendants Branch, Haug, and

Ricks, we note that Plaintiff must first show that "he possessed a protected liberty or property

interest, and that he was deprived of that interest without due process."  *Hynes v. Squillace*, 143

F.3d 653, 658 (2d Cir. 1998).  Courts have held, however, that inmates do not have a

constitutionally protected <u>liberty or property interest</u> in being served a particular type of meal.  *See,*

*e.g.*, *McKinley v. Murphy*, 974 F.2d 1340, 1340 (7th Cir. 1992) (no liberty interest in being served

particular meal); *Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990) (same); *Moore v. Kennedy*,

1996 WL 452279, at * 2 (S.D.N.Y. Aug. 8, 1996) (no liberty interest in being served vegetarian

diet).  Furthermore, in his opposition papers, Plaintiff for the first time asserts what purports to be a

*Sandin* issue in that he claims he was sentenced and confined to the "Box" for twenty-four months

without due process of law.  Plaintiff makes passing reference to various procedural violations

which allegedly occurred in connection with an unspecified Tier III Superintendent's Disciplinary

Hearing.  As Defendants correctly point out in their Reply Brief, such allegations were not contained

in Plaintiff's Amended Complaint and therefore it is wholly improper for Plaintiff to raise them for

the first time in his opposition to Defendants' Motion for Summary Judgment.  *See* Dkt. No. 49,

Defs.' Reply; *see also In re Private Capital Partners, Inc.*, 139 B.R. 120, 124-25 (Bankr. S.D.N.Y.

1992) (citing cases for the proposition that a plaintiff's attempt to amend his complaint by

instituting new causes of action in his opposition papers to defendants' dispositive motion is in

direct contravention of, and amounted to an attempt to circumvent, the Federal Rules of Civil

*-21-*

Procedure, namely Rule 15(a)).  Accordingly, we recommend **dismissal** of all Plaintiff's Fourteenth

Amendment due process claims.

### E.  First Amendment Claim

Moore has asserted a First Amendment claim solely against Defendant Glenn Goord, DOCS

Commissioner, on the basis that DOCS Directive 4311 violates his civil rights because it "forced"

him to choose between his medically prescribed diet and the religious alternative diet, instead of

giving him both simultaneously.  Dkt. No. 8, Am. Compl. at ¶¶ 35 & 39.  DOCS Directive 4311,

Therapeutic Diets, Section II.04, Religious Alternative Menu, states, in part:

> The Religious Alternative Menu is **not** a therapeutic diet and shall **not** be prescribed by
> the health care provider.  The Religious Alternative entrees are **not** offered in
> combination with any therapeutic diet restrictions.

Dfts.' 7.1 Statement at ¶ 8; Pl.'s 7.1 Statement at ¶ 8; *see also* Dkt. No. 40, Ex. F at p. 7.

In Plaintiff's assessment, Directive 4311 forced him to make a decision between his religious

consciences and his health.  Plaintiff further states that Goord is being sued in his capacity as

Commissioner since he "has the authority to make, change and/or modify in-house policies and

directives, which affect all prisoner's in the State owned Correctional Facilities within New York."

Dkt. No. 8, Am. Compl. at ¶ 34.

First, to the extent Plaintiff has asserted a claim against Defendant Goord in his official

capacity, we note that such claim should be **dismissed** for the reasons stated hereinabove, except to

the extent, if at all, Plaintiff seeks injunctive relief, *i.e.*, requesting DOCS Directive # 4311 not be

applied to him.  *See supra* Part II.B (Eleventh Amendment Analysis).  Second, the Court draws

attention to the discussion above on personal involvement and notes that Plaintiff has not attributed

any direct personal involvement by Defendant Goord, that is, beyond Goord's superordinate role as

Commissioner.  While it is true Plaintiff filed grievances to this effect, and even wrote a letter to Goord, there is no evidence that Goord ever saw Plaintiff's submissions.  The notion that Goord never was aware of these complaints is bolstered by the fact that Howard Dean, DOCS Director of Nutritional Services, who is not a party to this action, responded to Plaintiff's letter on Goord's behalf.

Absent direct participation by Glenn Goord, we look to other circumstances where the Second Circuit has indicated a supervisory official may be personally involved.  Specifically, and worthy of repetition, in addition to direct participation, a supervisory official may be "personally involved" in a § 1983 violation if he:  (1) after learning of the violation, failed to remedy the wrong; (2) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (3) was grossly negligent in managing subordinates who caused the unlawful condition or event.  *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).  It appears that Plaintiff is asserting Goord's involvement has stemmed from point two, in that he created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue.  We now turn to the Directive at issue and analyze Moore's First Amendment claim.

The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. CONST. amend. I.  These provisions are applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *See, e.g.*, *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (cited in *Wares v. D.A. Vanbebber*, 319 F. Supp. 2d 1237, 1247 (D. Kan. 2004)).  Prisoners retain their right to religious freedom even when incarcerated.  *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999).  An inmate is entitled to a reasonable accommodation of his religious beliefs, which

includes religious dietary beliefs.  *See id.* (citing *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992);

*Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975)).

The Supreme Court has held that when a prison policy violates a prisoner's constitutional

rights, courts should employ a reasonableness test, as opposed to a stricter standard which would

normally be applied in constitutional deprivation cases.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342,

349 (1987); *see also Turner v. Safely*, 482 U.S. 78, 89 (1987).  Therefore, a prison regulation that

impinges upon an inmate's constitutional rights may be valid, despite such encroachment, if it is

reasonably related to legitimate penological interests.  *Turner v. Safely*, 482 U.S. at 89; *Farid v.*

*Smith*, 850 F.2d 917, 925 (2d Cir. 1988).  The underlying purpose of the implementation of a lower

standard is congruous with the notion that "evaluation of penological objectives is committed to the

considered judgment of prison administrators, 'who are actually charged with and trained in the

running of the particular institution under examination.'" *O'Lone v. Estate of Shabazz*, 482 U.S. at

349 (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)).  The Second Circuit has directed courts

faced with constitutional free exercise claims to first assess,

> (1) whether the practice asserted is religious in the person's scheme of beliefs, and
> whether the belief is sincerely held; (2) whether the challenged practice of the prison
> officials infringes upon the religious belief; and (3) whether the challenged practice of
> the prison officials furthers some legitimate penological objective.

*Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988); *see also Fifth Ave. Presbyterian Church v. City of*

*New York*, 293 F.3d 570, 547 (2d Cir. 2002) ("An individual claiming violation of free exercise

rights need only demonstrate that the beliefs professed are sincerely held and in the individual's own

scheme of things, religious.") (internal quotation marks and citations omitted) (quoted in *Ford v.*

*McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003)).

In moving for summary judgment on Moore's First Amendment claim, Defendant Goord

postulates that Plaintiff has failed to meet his burden in demonstrating that Directive # 4311 placed a substantial burden on his free exercise, compounded or exemplified by the fact that Plaintiff has not stated what religion he belongs to, nor has Plaintiff alleged interference with a particular practice, that such practice was religious, or that any particular belief was sincerely held.  Before assessing whether Plaintiff has satisfied his burden under factor one in the *Farhid* test, the Court addresses Defendant's assessment of Plaintiff's burden in establishing a substantial burden.

It is not entirely clear in this Circuit whether a prisoner plaintiff complaining of religious infringement must, as a prerequisite to stating a constitutional free exercise claim, establish that the prison policy at issue "substantially burdened" the free exercise of his religion.  In a recent Second Circuit opinion, the Court analyzed whether a prisoner is required to show that a substantial burden existed.  *See McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004) (questioning whether the substantial burden standard must be applied in <u>constitutional</u> free exercise claims and citing to *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) and *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002) as support for the Third Circuit's policy of explicitly rejecting the substantial burden analysis as violating the precept, articulated in *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990), that "courts must not presume to determine the place of a particular belief in a religion").  On more than one occasion, the Second Circuit has declined to decide whether the substantial burden test applies to free exercise claims.  *See, e.g.*, *id.*; *Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003).  Such hesitation stems from the notion that, "[a]pplying the substantial burden test requires courts to distinguish important from unimportant religious beliefs, a task for which [the Second Circuit] has already explained courts are particularly ill-suited [due to] the danger that courts will make conclusory judgments about the unimportance of

the religious practice to the adherent[.]" *Ford v. McGinnis*, 352 F.3d at 593.

In explicating its doubt as to whether a plaintiff asserting a constitutional free exercise claim must first make a showing of a substantial burden, the Second Circuit, in *Ford v. McGinnis*, traced the origin of the substantial burden test to the Supreme Court's decision in *Sherbert v. Verner*, 374 U.S. 398 (1963), which established a higher scrutiny test wherein government actions that substantially burden a religious practice must be justified by a compelling government interest. *Id.* This test, however, was subsequently modified to a less rigorous, more deferential test when applied to claims arising out of a prison context, *see O'Lone v. Estate of Shabazz*, 482 U.S. at 342, wherein officials need only show that burdens placed upon an inmate's free exercise are reasonably related to legitimate penological interests; such modification, however, made no mention of a prisoner's continuing obligation to demonstrate that the burden at issue was substantial. *Id.* The substantial burden test had been applied by the Second Circuit in the context of interpreting the now repealed Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. 2000bb, *invalidated by City of Boerne v.Flores*, 521 U.S. 507, which mandated application of a strict scrutiny standard to government policies that impose "substantial burdens" on religious beliefs, *see Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996); presumably, the substantial burden requisite would still be applied in the context of interpreting the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. 2000cc-1, which has similarly instituted a stricter standard of scrutiny. With all of this being said, however, in the context of constitutional free exercise claims, which the prison realm requires application of a lower reasonableness standard, it remains unclear whether a substantial burden needs to be established. *See McEachin v. McGuinnis*, 357 F.3d at 203 (declining to decide "whether the plaintiff must demonstrate that the burden on his beliefs was

'substantial' in order to state a constitutional claim).

Casting all incertitude aside, since the Second Circuit has declined thus far to provide an answer to this question, we must err on the side of caution and ascertain whether Plaintiff has established that a substantial burden has been placed upon his right to freely exercise his religion. In those narrow circumstances, when the Second Circuit has applied the substantial burden test, they defined a substantial burden as "a situation where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (quoting *Jolly v. Coughlin*, 76 F.3d at 477). Applying this definition to the case at bar, with the reservation as to whether it even applies, and construing any ambiguities in the non-movant's favor, the Court finds that DOCS Directive # 4311, on its face, places a substantial burden on Moore's free exercise, in that it places substantial pressure on Moore to choose between his health and adhering to his religious scruples. At a minimum, the Court finds that Plaintiff has satisfactorily raised a material issue of fact as to whether his diet is central to his religion and, whether DOCS Directive # 4311 placed a substantial burden on his religious beliefs.

As to Defendant's argument that Plaintiff has not properly alleged a religious affiliation, we concede that in Moore's Amended Complaint, Plaintiff merely alleges interference with receipt of his religious meals. Dkt. No. 8, Am. Compl. at ¶¶ 33-41. He does not, however, specify in such pleading which religious tenets he observes. The Court notes that Plaintiff has proceeded in this action *pro se* and that, as such, the Court is compelled to adhere to a policy of leniency when perusing claims stated in pleadings. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *see also Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [a *pro se* litigant's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest."). In his

opposition papers to Defendants' Motion, Plaintiff elaborates on his religious beliefs and scruples. In drawing all inferences and ambiguities in favor of the non-movant, herein Plaintiff, the Court finds that Plaintiff adheres to the teachings of Islam.  In his Memorandum of Law, Moore clearly states that Defendant's policy has "curtailed" his ability to receive his religious diet in accordance with the tenets of Islam, and his religious affiliation, as reflected in his Affidavit, is Islam.  Dkt. No. 47 at pp. 2 & 7-8; *see also* Dkt. No. 46, Moore Aff. at ¶¶ 44, 47-51, 53, & 63.  In his Affidavit, Moore expounds, with specificity and references, the Islamic mandates with regard to dietary laws. Dkt. No. 46 at ¶ 48 (describing the dietary laws of Shari'ah (Islamic Law) as controlling on the issue of preparation of the food served).[16]  Thus, we find that Plaintiff has sufficiently met his burden in opposing Defendant Goord's claim that he has not affiliated himself with a particular religion or religious practice.  At a minimum, Plaintiff has raised an issue of material fact with regard to his religious preference as well as the subjective sincerity of his beliefs.  *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("In free exercise cases, scrutiny of the prisoner's sincerity is often essential in 'differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.'" (quoting *Patrick v. LeFevre*, 745 F.2d 153,

---

[16] In his Affidavit, Plaintiff explains the dietary religious laws he adheres to as follows:

There is a prerequisite in order for food to be edible under the dietary laws of the Shari'ah (Islamic Law). Any and all food that comes from sea water is edible.  Pork, only under one circumstance can be eaten [i]f one is on his death bed, and there is absolutely no other food around.  All other food has to be slaughtered a certain way (1) mentioning the name of ALLAH over it right before [or during the] time the animal is killed (by slitting its throat), the slitting is done so that the animal is killed instantly without any suffering, (2) all the blood has to be drain [sic] out of the animal.  (See Noble Qur'an surah #5 ayat 1-5.)  Only when the food meets this criteria can it be considered Halal (pure/permissible).  Also food, that conforms to the dietary laws of Judaism (commonly known as Kosher) are edible.

Dkt. No. 46, Moore Aff. at ¶ 48.

Plaintiff also indicates that once Harem (prohibited) foods are included in his meals, the "entire meal becomes contaminated rendering it inedible."  *Id*. at ¶ 47.

157 (2d Cir. 1984)).

As to the third factor enumerated in *Farhid*, Defendant Goord asserts that the challenged practice indeed furthers some legitimate penological interest, namely "running a simplified food service, rather than one that gives rise to many administrative difficulties." Dkt. No. 40, Mem. of Law at p. 15 (citing *Kahey v. Jones*, 836 F.2d 948, 950 (5th Cir. 1988); *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993)). The Court notes, however, that Defendant has placed emphasis on Fifth Circuit decisions for the proposition that

> prisons need not respond to particularized religious dietary requests, because 'if one
> such dietary request is granted, similar demands will proliferate, with two possible
> results: either accommodation of such demands will place an undue burden on the prison
> system, or the prisons would become entangled with religion while drawing fine and
> searching distinctions among various free exercise claimants.'

Dkt. No. 40, Mem. of Law at p. 15 (citing *Udey v. Kastner*, 805 F.2d 1218 (5th Cir. 1986); *Kahey v. Jones*, 836 F.2d 948, 950 (5th Cir. 1988)).

In this Circuit, however, settled law, dating back to 1975, dictates that prison officials **must** provide inmates with "a diet sufficient to sustain the prisoner in good health without violating [that inmate's religious] dietary laws, without otherwise mandating specific items of diet." *Kahane v. Carlson*, 527 F.2d 492, 496 (2d Cir. 1975) (emphasis added). *Kahane* has never been overruled. *See Benjamin v. Coughlin*, 905 F.2d 571, 579 (2d Cir. 1990) (quoting *Kahane* for the proposition that prisoners have the right to receive diets consistent with their religious scruples); *see also Brown v. Johnson*, 2003 WL 360118, at *5 (W.D.N.Y. Feb. 14, 2003) (quoting *Kahane* and *Benjamin* for the same proposition and emphasizing that *Kahane* has never been overruled and is consistently cited by courts in the Second Circuit).

The reasonable test employed herein involves a series of burden shifting between the parties. Once a prisoner has established a constitutional violation, as the present case has been shown to do,

the prison officials' conduct may still be valid if they can show their policies are reasonable.

"[O]nce prison officials put forward a legitimate penological interest to justify an infringement upon

a prisoner's religious free exercise, the burden remains with the prisoner to 'show that these

[penological] concerns were irrational.'" *Ford v. McGinnis*, 352 F.3d at 595-96 (quoting *Fromer v.*

*Scully*, 874 F.2d 69, 74 (2d Cir. 1989)).

      The Supreme Court has enumerated various factors for courts to consider when ruling upon

the reasonableness of a prison policy which allegedly impedes or interferes with a prisoner's

constitutional rights:

> [1] there must be a 'valid, rational connection' between the prison regulation and the
> legitimate governmental interest put forward to justify it [citation omitted][;]
> [2] whether there are alternative means of exercising the right that remain open to prison
> inmates[;]
> [3] the impact accommodation of the asserted constitutional right will have on guards
> and other inmates, and on the allocation of prison resources generally[; and]
> [4] the absence of ready alternatives is evidence of the reasonableness of a prison
> regulation.

*Turner v. Safely*, 482 U.S. 78, 89-91 (1987).

      Turning to the first factor with an eye towards Directive 4311, we note that the reasoning

proffered must not be remote as to render a policy arbitrary or irrational.  Defendant Goord has

offered two rationales for Directive # 4311, namely, running a simplified food service and the

adverse impact on prison morale that would result should some accommodations be given but not

others.  On its face, these two rationales appear to be legitimate.

      The second factor requires us to assess whether the prison has provided alternative means for

prisoners to exercise religious rights.  Defendant Goord emphasizes that the prison officials did not

"force" Plaintiff to continue on one diet or the other.  They allowed Plaintiff to disregard the

Regional Dietitian's recommendation that he not be on the RAM diet as long as he signed a waiver

to that effect.  But Defendant has, in fact, made Plaintiff choose between his health and his religious

beliefs since, by virtue of Directive # 4311, Plaintiff cannot receive both.  This is especially

compelling for a prisoner in Moore's position, housed in SHU, who typically does not have

commissary privileges to supplement his appetite.  *Cf. O'Lone v. Estate of Shabazz*, 482 U.S. at

351-52 (finding that prison policy of mandating inmate work force to remain outside for an

uninterrupted blocked off period of time, which prevented Muslim inmates from participating in

Jumu'ah, a religious service, was reasonable and valid due to, *inter alia*, the availability of these

Muslims to participate in and exercise their religious beliefs through other religious ceremonies, like

Ramadan); *Abdul-Malik v. Goord*, 1997 WL 83402, at *8 (S.D.N.Y. Feb. 27, 1997) (analyzing the

*Turner* factors and finding that because Plaintiff had access to the commissary and could also

receive up to thirty-five pounds of prepared food from outside sources, alternative means were

available to an inmate challenging the sufficiency, or adequacy, of the RAM diet); *see also* N.Y.

COMP. CODES R. & REGS. tit. 7, §§ 302.2(j) & 303.3 (limiting, *inter alia*, certain package and

commissary privileges for an inmate housed in SHU).  Prison officials apparently allowed Plaintiff

to deviate from, or at least modify, his therapeutic diet in order for him to observe Ramadan.  *See,*

*e.g.*, Dkt. No. 46, Moore Aff. at ¶ 13; Dfts.' 7.1 Statement at ¶ 16.  Yet for the rest of his meals

outside this one to two month period, he was not able to receive religious meals.  Therefore, given

Plaintiff's confinement in SHU, Plaintiff lacked any available alternatives in following the dietary

laws of his religion.

      The third factor requires us to assess the impact accommodation will have on guards and

other inmates as well as allocation of prison resources.  Defendants seems to suggest that

accommodation of Plaintiff's request will have a significant ripple effect on prison morale if others

are not similarly accommodated, and were all the prisoners to be similarly accommodated, then the ripple effect may impede the ease of administrative facilitation.  The Court concedes that ease of administration is certainly a legitimate and rational justification, however, the Court is somewhat troubled as to whether Defendant has truly met his burden as the moving party in eliminating the possibility that an issue of material fact remains disputed.  To be more specific, Defendant acknowledges that therapeutic/medically prescribed diets are available to inmates who receive meals from the "regular menu" (menu served to inmates who do not follow religious dietary laws).  Indeed, it is clear that Plaintiff's meals have been accommodated from the regular menu meal plan.  Defendant Goord has also explained that many of the RAM food items contain eggs, cheese, and soy-based products, which include wheat and corn.  But so do many of the food items contained in the regular menu meal plan.  We are unclear as to why accommodation of Plaintiff's multiple allergies are easily accommodated as to one menu but not the other.  According to Plaintiff, the importance of the RAM menu is simply food preparation.  Were he to receive the same food as the regular menu, even modified for his allergies, his religious tenets may still be compromised if certain food items to which he is not allergic but have not been properly prepared remain on his tray, thus rendering, in his estimation, his entire tray inedible.  Again, we do not question the legitimacy of the rationales set forth *per se*, however, had more information been provided, *i.e.*, statistics or explanations as to the facilitation and preparation of meals, we might be in a better position to adjudicate on the reasonableness of such policy.  Having not been provided with any such information, this Court feels a question of material fact exists, thus precluding summary judgment.

Finally, the Court must consider the availability of ready alternatives.  The Supreme Court has directed that, while prison officials need not consider and rule out every alternative possible, "if

an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interest, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner v. Safely*, 482 U.S. at 90-91.

Plaintiff, in our appraisal, has raised a significant question which is material in adjudicating his First Amendment claim, namely, why, in light of the fact that the emphasis of the RAM menu is food preparation, he could not be on the RAM diet with proper accommodation for his food allergies. None of Defendant's assertions cogently explain why the prohibition of a combination diet is reasonably related to a legitimate penological interest, nor has Defendant Goord appropriately shown what impact an accommodation of Plaintiff's request would have on the prison system. *See Brown v. Johnson*, 2003 WL 360118 (W.D.N.Y. Feb. 14, 2003) (applying the *Turner* test in assessing the reasonableness of a DOCS Directive # 4311, which prohibits a combination meal consisting of a therapeutic diet and a religious diet, and finding that summary judgment was not appropriate given that, *inter alia*, defendants "failed in their duty to show entitlement to judgment as a matter of law under the *Turner* test", in that they failed to put forth legitimate arguments of penological interests as well as lack of information as to impact accommodation would have on the facility).  As to the issue of reasonableness of the policy at issue, Defendant, as the moving party, bears the burden of production as well as the burden of persuasion; Defendant Goord has failed to meet his burden and such precludes summary judgment. *See* 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1] (3d ed. 1999) (discussing burdens of production and persuasion on summary judgment motions).

Finally, Plaintiff has seemingly included in his opposition papers, for the first time, a claim pursuant to the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42

U.S.C. 2000cc-1.  RLUIPA provides that,

> [n]o government shall impose a substantial burden on the religious exercise of a person
> residing in or confined to an institution . . . even if the burden results from a rule of
> general applicability, unless the government demonstrates that imposition of the burden
> on that person–
>> (1) is in furtherance of a compelling governmental interest; and
>> (2) is the least restrictive means of furthering that compelling governmental
>> interest.

42 U.S.C. § 2000cc-1(a).

As previously noted, the Court finds inclusion of this claim for the first time in opposition papers to

be improper.  *See In re Private Capital Partners, Inc.*, 139 B.R. 120, 124-25 (Bankr. S.D.N.Y.

1992) (citing cases for the proposition that a plaintiff's attempt to amend his complaint by

instituting new causes of action in his opposition papers to defendants' dispositive motion is in

direct contravention of, and amounted to an attempt to circumvent, the Federal Rules of Civil

Procedure, namely Rule 15(a)).  However, the Court is mindful of the Second Circuit's direction to

liberally construe *pro se* prisoner pleadings.  In a recent Second Circuit decision, the Court found

that, while the prisoner plaintiff only cited constitutional violations in his complaint, such pleading

may also support a claim under RLUIPA.  *McEachin v. McGuinnis*, 357 F.3d 197, 199 n.2 (2d Cir.

2004) ("It is well-established that the failure in a complaint to cite a statute, or to cite the correct

one, in no way affects the merits of a claim[;] [f]actual allegations alone are what matters." (internal

quotation marks and citations omitted)).  After reading Plaintiff's Amended Complaint in a more

liberal fashion, the Court finds that Moore may have included enough facts for this Court to find

that, indeed, he raises, without citing the specific statute, a claim under RLUIPA.  While the

constitutionality of RLUIPA has not been addressed in this Circuit, other federal courts are torn.

We need not consider such issue here, nor do we need to assess whether a violation of this statute

occurred since, at the time the acts giving rise to Plaintiff's religious claims arose, the contours of

this then newly enacted statute was not clearly established.  Thus, to the extent Plaintiff has asserted

a claim pursuant to RLUIPA, Defendant Goord would surely be entitled to qualified immunity as

that law is applied, as explained more fully below.

### F.  Qualified Immunity

Defendants have asserted the defense of qualified immunity as an alternate basis for deciding

in their favor.  The doctrine of qualified immunity shields public officials from suit for conduct

undertaken in the course of their duties if it "does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  *Harlow v. Firzgerald*, 457

U.S. 800, 818 (1982); *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir. 1988).  The doctrine protects

public officials from 'personally facing the risk of incurring ruinous liability in the form of money

damages, which would deter qualified people from public service."  *Eng*, 858 F.2d at 895.  Whether

an official protected by qualified immunity may be held liable for an alleged unlawful action turns

on the objective legal reasonableness of the action assessed in light of the legal rules that were

clearly established at the time the action was taken.  *Anderson v. Creighton*, 483 U.S. 635, 639

(1987); *Lewis v. Cowan*, 165 F.3d 154, 166 (2d Cir. 1999).

To determine whether a right was clearly established for purposes of qualified immunity,

courts must consider "whether the right was defined with reasonable specificity; whether decisional

law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under

preexisting law, a defendant official would have reasonably understood that his [or her] actions were

unlawful."  *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995); *see also Nicholas v. Miller*, 189

F.3d 191, 195 (2d Cir. 1999).

A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997) (citations omitted).

With respect to Defendant Goord, at the time the events giving rise to Plaintiff's First and Fourteenth Amendment Equal Protection claims occurred, and even as early as 1975, it was clearly established law in this Circuit that prison officials must provide inmates with a "diet sufficient to sustain the prisoner in good health without violating the [prisoner's religious] dietary laws, without otherwise mandating specific items of diet." *Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975). As stated above, *Kahane* has never been overruled and remains the law in this Circuit despite recent congressional and Supreme Court actions. *See, e.g.*, *Bass v. Coughlin*, 800 F. Supp. 1066, 1071-72 (N.D.N.Y.), *aff'd*, 976 F.2d 98 (2d Cir. 1992) (stating that the principle established in *Kahane* was not placed in any reasonable doubt by intervening Supreme Court rulings). Thus, summary judgment on qualified immunity grounds is inappropriate as to Plaintiff's remaining claims. *See Brown v. Johnson*, 2003 WL 360118, at *9-10 (W.D.N.Y. Feb. 14, 2003) (assessing the reasonableness of DOCS Directive # 4311 and refusing, as a matter of law, to grant summary judgment on the issue of qualified immunity for defendants' failure to provide plaintiff with a low fat, low cholesterol meal consistent with his religious beliefs); *see also Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (holding that the law in this Circuit clearly establishes a prisoner's right to a diet consistent with his or her religious scruples and absent a legitimate penological justification,

prison officials denying a prisoner "a feast imbued with religious import" was unlawful).

As stated above, however, with regard to any claim asserted under RLUIPA, the Court finds that at the time the acts committed giving rise to Plaintiff's religious claims, the contours of this statute were not clearly established, thus Defendant Goord would be entitled to qualified immunity for any violation, if at all, of this statute as a matter of law.  As for Defendants Ricks, Branch, Haug, and Eagan, with regard to Plaintiff's other claims, pursuant to the Eighth and Fourteenth Amendments, the Court finds that consideration of this affirmative defense is not warranted in light of our finding that no constitutional violation occurred.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

**WHEREFORE**, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 40) be **GRANTED** as to all claims (pursuant to the Eighth and Fourteenth Amendments) stated against Defendants Eagen, Ricks, Haug, and Branch; and it is further

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 40) be **DENIED** as to Defendant Goord for Plaintiff's First Amendment and Fourteenth Amendment Equal Protection claims; and it is further

**RECOMMENDED**, that, to the extent Plaintiff's Amended Complaint can be construed to have asserted an Eighth Amendment claim against Defendant Goord, such claim should be **DISMISSED**;

**RECOMMENDED**, that, to the extent Plaintiff has asserted a claim against Defendant Goord pursuant to RLUIPA, Goord should be entitled to qualified immunity and such claim should

be **DISMISSED**; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Report-Recommendation and

Order upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing

report to the **U.S. DISTRICT  JUDGE** assigned to this case.  Such objections shall be filed with

the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT TO THE U.S. DISTRICT</u>**

**<u>JUDGE WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>** *Roldan v.*

*Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Sec'y of Health and Human Servs.* 892 F.2d 15 (2d

Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), & 6(e).


SO ORDERED

Dated:  September 14, 2004
         Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge